UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

LARNELL HENDRICK,
*Prisoner Identification No. 209-362*,

    Plaintiff,

v.

MS. BOOTH, *Associate Psychologist*, and
WILLIAM BOHRER, *Security Chief*,

    Defendants.

Civil Action No. TDC-14-4021

**MEMORANDUM OPINION**

Plaintiff Larnell Hendrick has been diagnosed with papilledema and pseudotumor cerebri and is currently incarcerated at North Branch Correctional Institution ("NBCI") in Cumberland, Maryland. He has filed a Complaint under 42 U.S.C. § 1983, alleging that Defendants Laura Booth[1] and William Bohrer violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution by refusing his requests to be housed in a single cell and for mental health treatment. ECF No. 1. Pending before the Court is Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment ("Motion to Dismiss"), filed on March 2, 2015. ECF No. 8. The Motion is fully briefed and ripe for disposition. No hearing is necessary to resolve the issues. *See* D. Md. Local R. 105.6. For the reasons that follow, the Motion is GRANTED.

---

[1] Although Hendrick names "Ms. Booth" as the defendant, Booth's Motion to Dismiss indicates that her full name is "Laura Booth."

## BACKGROUND[2]

### I.     Hendrick's Diagnosis and Placement in a Single Cell

Hendrick has been diagnosed with papilledema and pseudotumor cerebri, which causes him to "suffer complete loss of vision, blackouts, migraine headaches, [and] dizziness." Compl. ¶ 1. On January 21, 2011, Hendrick submitted a request for a single cell based on his medical condition. On January 25, 2011, an NBCI physician assistant evaluated Hendrick and recommended that he "needs to be double celled so there is someone to look out for him." Hendrick Medical Records ("Med. Records"), at 34, Def.'s Mem. in Supp. of Mot. Dismiss (Def.'s Mem.") Ex. 3, ECF No. 8-4. On February 10, 2011, Hendrick met with an ophthalmologist, Dr. Summerfield, complaining that his vision was blurred. Dr. Summerfield reported that Hendrick was "very adamant about single cell" and that although he saw no "objective findings," he had "no objection to patient receiving single cell." Med. Records at 33.

On February 16, 2011, Dr. Evan Lewis, a neurological physician from the University of Maryland Medical Center, evaluated Hendrick. Following the evaluation, Dr. Lewis wrote Hendrick a prescription, in which he recommended "Individual Housing of Prisoner." Med. Records at 29. A physician assistant's medical notes from a February 25, 2011 examination, however, state that although Hendrick asked for a single cell because he did not trust other inmates, he "was advised again that the[re] is currently no medical indication for single cell

---

[2] Additional background can be found in the Court's Memorandum Opinion on the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment in a related case, *Hendrick v. Wexford Health Sources, Inc.*, No. TDC-14-2544, 2015 WL 5766320, at *1–9 (D. Md. Sept. 29, 2015). The Court granted summary judgment in favor of Wexford Health Sources, Inc. and several medical personnel at NBCI on the claim that the decision to place Booth in a single cell constituted deliberate indifference to a medical need and presented an excessive risk to inmate health and safety, in violation of the Eighth Amendment. *Id.* at *6-9. A separate Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, filed by the four defendants who are NBCI security personnel, remains pending.

status," he "currently demonstrates no neurologic [symptoms] that would necessitate placement in a single cell," and he "was previously told that a cellmate would be able to notify staff if his condition declines." *Id.* at 38. The same day, Dr. Summerfield, having reviewed Dr. Lewis's recommendation, indicated that he was "in [f]avor of a single cell" for Hendrick. *Id.* at 40. Another doctor, Dr. Getachew was "comfortable going w/ the Ophthalmologist's & Neurologist's suggestion," so an order was issued for single cell status for one year "for condition that may result in blindness." *Id.*

Hendrick's single cell order was renewed on November 21, 2012. When that period ended on November 21, 2013, Hendrick was placed in a double cell until his single cell status was reinstated for one year beginning on February 4, 2014.

## II. Hendrick's Return to a Double Cell

On July 16, 2014, various medical professionals met with Hendrick at a "multidisciplinary patient care conference" to discuss his condition. Med. Records at 78. The team included Booth, an associate psychologist. Hendrick reported that his vision was worsening, that he blacked out on occasion, and that he suffered from vertigo, anxiety, and claustrophobia. Booth observed that many of the symptoms Hendrick described were "congruent with effects that could be caused by his medical condition, despite his insistence that his symptoms were psychological" and that "[m]any mental health diagnoses require that it be ruled out that the symptoms are not caused by a primary medical condition." Booth Decl. ¶ 4, Def.'s Mem. Ex. 2, ECF No 8-3. She also observed that "[t]he symptoms inmate Hendrick complained of were suspect of malingering, specifically, exaggeration." *Id.*

The team repeated prior recommendations that Hendrick undergo surgery, but Hendrick reiterated his consistent refusal to do so. Dr. Ava Joubert reported that "[a]fter lengthy

discussion with the patient and others present, the patient appears to be fully competent to make an informed decision regarding his refusals, and there does not appear to be indication to continue single cell status. To the contrary, in light of his history of 'blacking out' it would be to his benefit to have a cell mate." Med. Records at 78. Hendrick was moved to a double cell on July 24, 2014.

To protest the move, Hendrick began a hunger strike on July 23, 2014 that lasted over a week. During the hunger strike, he received at least three visits from nurses to check on him. Hendrick submitted "sick call request" forms on July 25, 2014; July 26, 2014; August 10, 2014; September 1, 2014; September 27, 2014; September 28, 2014; November 11, 2014; and November 16, 2014. In each of these requests, his specific request was to be returned to a single cell. Among the reasons he cited were his blackouts, migraine headaches, dizziness, vision problems, soiling himself, anxiety, hearing voices, and concern about possible attacks by cellmates.

Hendrick had medical visits at which he was seen by medical professionals on July 28, 2014; July 29, 2014; July 31, 2014; August 12, 2014; August 29, 2014; September 5, 2014; October 8, 2014; and December 4, 2014. On each occasion, his primary request was to be returned to a single cell. Among the issues he raised were his blackouts, loss of vision, dizziness, headaches, and anxiety deriving from having a cellmate. On the September 5, 2014 visit, he "[d]enie[d] seeing [behavioral health] personnel for counseling" but agreed to see a counselor to "discuss fears and anxiety." Med. Records at 5. According to Hendrick, the nurse told him that she would refer him for mental health treatment.

Hendrick also submitted an Inmate Request Form directed to Booth on November 11, 2014. As with some of his sick call requests, he reported "loss of vision, blackouts, dizziness,

migraine headaches," soiling himself, finding his "cellmate in outrage, anger, and outburst," difficulty moving his body, anxiety attacks, hearing voices, nightmares, difficulty sleeping, and seeing black spots. Booth Inmate Request Form, Compl. Ex. 1, ECF No. 1-1. His specific request was to "return me to my single cell." *Id.* Booth responded on November 19, 2014, writing that "your symptoms of anxiety are secondary to the medical issues you've cited above" and directing him to "please write to medical." *Id.*

According to Hendrick, he has "made repeated written inmate request slips to Ms. Booth . . . and verbal request[s] 'IN PASSING' notifying Ms. Booth that Plaintiff was suffering severe psychological and physical trauma from the combined effects of Plaintiff's medical condition and being housed inside of a cell with a cellmate, to NO AVAIL." Compl. ¶ 6 (emphasis in original). Hendrick alleges that he only sees Booth while waiting in line to receive his medication or when she walks past him "on the tier." *Id.* ¶ 7. On these occasions, Hendrick contends, Booth generally ignores or ridicules him, telling him on several occasions "I don't care what's going on with you, stand on the tier, just don't look in, I'm not seeing you, etc." *Id.* ¶ 7–8. Booth, however, asserts that "[a]t no time did I tell Hendrick that I would not see him." Booth Decl. ¶ 9. She asserts that in addition to her November 19, 2014 response, she also responded to a correspondence from Hendrick on July 28, 2014 by informing him that "the issues he described were primarily medical issues" and advising him "to self-refer to the medical department." *Id.* ¶ 5.

On November 16, 2014, Hendrick submitted a separate Inmate Request Form to Bohrer, the Chief of Security at NBCI, in which he requested once again to return to a single cell, pointing to "loss of vision, blackouts, dizziness, anxiety attacks, constant migraine headaches," hearing voices, and hallucinations. Bohrer Inmate Request Form, Compl. Ex. 2, ECF No. 1-2.

Bohrer responded on November 19, 2014 by noting that "you refused the medical treatment needed to help your condition" and that "[w]e have had multiple patient care conferences with you in which you are uncooperative." *Id.* He stated that Hendrick did not "meet the criteria for a single cell" and that he is "better off with someone in the cell in case of [a] medical emergency." *Id.* According to Bohrer, "Hendrick's medical issues are being monitored by the Medical Department" and his "mental health issues are being monitored by the Psychology Department." Bohrer Decl. ¶ 5, Def.'s Mem. Ex. 4, ECF No 8-5.

Despite Defendants' conclusions that Hendrick would be better off with a cellmate, Hendrick reports that his cellmates have been hostile to his presence. In July 2014, shortly after he was placed in a double cell, Hendrick blacked out in his cell, but his cellmate told officers correctional officers that "I want the dude out of my cell." Hendrick Decl. ¶ 41, Pl.'s Resp. Ex. 3, ECF No. 10-4. In December 2014, Adrian Jones, Hendrick's cellmate at that time, told NBCI officials that Hendrick was "on [his] own" and that Jones would "not notify" NBCI personnel of Hendrick's medical emergencies. *Id.* ¶ 33. Hendrick also alleges that Jones asked NBCI personnel to "get this dude out of [his] cell." *Id.* Hendrick claims that in December 2014 he submitted two administrative remedy procedure forms to Booth and Bohrer, in which he notified them of Jones's statements, but received no response. Hendrick states that on January 26, 2015, he blacked out and began to hallucinate that a bird was flying in his cell. He awoke later to find that he had assaulted Jones, leaving him bloodied. Hendrick was later found guilty of assaulting a fellow prisoner.

On December 24, 2015, Hendrick filed his Complaint in this case. In January 2015, Hendrick was seen by a nurse on two occasions. During these visits, when Hendrick mentioned his ongoing anxiety, blackouts, hallucinations, and hearing voices, the nurse told him that she

would notify Booth or Bohrer. However, Hendrick claims that neither Booth nor anyone else from the NBCI mental health department has seen him as a result.

In support of his concerns about his safety in a double cell, Hendrick asserts that from 2011 to 2014, numerous inmates have been found dead in double cells at NBCI and specifically references three instances between July 2014 and January 2015 in which cellmates assaulted or killed their cellmates.

## DISCUSSION

Hendrick's Complaint alleges that by allowing and failing to reverse his move to a double cell, Booth and Bohrer acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment, and violated his due process rights under the Fourteenth Amendment. Construed liberally, the Complaint further alleges that Booth violated the Eighth Amendment by refusing to provide mental health treatment when requested. Defendants seek dismissal of, or summary judgment on, Hendrick's claims. Because both parties have submitted evidence for the Court's review, the Motion is construed as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

**I.   Legal Standard**

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Felty v. Grave–Humphreys Co.*,

818 F.2d 1126, 1128 (4th Cir. 1987). The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

## II.     Eighth Amendment Claims

### A. "Deliberate Indifference"

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977) (holding that officials violate the Eighth Amendment if they act with deliberate indifference to a serious psychological need). To be "serious," the condition must be "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson*, 775 F.3d at 178 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)) (internal quotation marks omitted); *see also Russell v. Sheffer*, 528 F.2d 318, 318 (4th Cir. 1975) (per curiam) ("Questions of medical judgment are not subject to judicial review."). "An official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson*, 775 F.3d at 178 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (internal quotation marks omitted). "[I]t

is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* (citations omitted). Thus, a deliberate indifference claim has both an objective component, that there objectively exists a serious medical condition and an excessive risk to the inmate's health and safety, and a subjective component, that the official subjectively knew of the condition and risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (holding that an official must have "knowledge" of a risk of harm, which must be "objectively, sufficiently serious").

Deliberate indifference is an "exacting standard" that requires more than a showing of "mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* (citations omitted); *Rich v. Bruce*, 129 F.3d 336, 339 (4th Cir. 1997) (finding that even when prison authorities are "too stupid" to realize the excessive risk their actions cause, there is no deliberate indifference). To constitute deliberate indifference to a serious medical need, the defendant's actions "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990).

### B. Denial of a Single Cell

Hendrick alleges that Booth and Bohrer acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment by placing him in a double cell and failing to return him to a single cell. Hendrick suffers from papilledema and pseudotumor cerebri, which have resulted in, at various times, temporary vision loss, dizziness, blackouts, and hallucinations, and he asserts that he needs a single cell because of the risk that a cellmate will

take advantage of his condition and assault him, such as if he blacks out or experiences vision loss.

Placing an inmate in a cell with another inmate generally does not violate the Eighth Amendment. *See Rhodes v. Chapman*, 452 U.S. 337, 347–50 (1981). To show deliberate indifference, Hendrick must establish that (1) there objectively was an excessive risk to inmate health and safety based on his placement in a double cell; and (2) Defendants actually knew of that risk and disregarded it. *See Farmer*, 511 U.S. at 834, 837.

This Court has already denied Hendrick's deliberate indifference claim arising from his placement in a double cell in a related case against Dr. Joubert and other medical personnel on the multidisciplinary team that evaluated Hendrick on July 16, 2014. *See Hendrick v. Wexford Health Sources, Inc.*, No. TDC-14-2544, 2015 WL 5766320, at *1-9 (D. Md. Sept. 29, 2015). The analysis in that case is equally applicable to the claims against Booth and Bohrer because Hendrick's evidence is insufficient to establish the objective component of the test, that his placement in a double cell presents an excessive risk to inmate health and safety.

As discussed in *Wexford Health*, Dr. Joubert's finding after the July 16, 2014 meeting, that "there does not appear to be indication to continue single cell status . . . in light of [Hendrick's] history of 'blacking out' it would be to his benefit to have a cell mate," was consistent with some of the views expressed when the issue was first raised in 2011. Med. Records at 78. The medical notes of a February 25, 2011 examination state that although Hendrick asked for a single cell because he did not trust other inmates, "Patient was advised again that the[re] is currently no medical indication for single cell status," and that he "currently demonstrates no neurologic [symptoms] that would necessitate placement in a single cell and was previously told that a cellmate would be able to notify staff if his condition declines." *Id.* at

38. Although some doctors, such as Dr. Lewis of the University of Maryland Neurosurgery Associates, recommended a single cell without substantive explanation, Hendrick's single cell status was not maintained continuously, and no doctor articulated reasons for the single cell status that indicate "an excessive risk to inmate health or safety" arising from a double cell. *Jackson*, 775 F.3d at 178.

At most, therefore, Hendrick can show that the decision to place him in a double cell differed with his view and the views of other medical professionals. But the fact that medical professionals may differ on a recommended course of treatment does not establish deliberate indifference. *See id.* In *Jackson*, the United States Court of Appeals for the Fourth Circuit found no deliberate indifference when a general practitioner failed to diagnose a serious heart condition and altered the treatment plan, even though a cardiologist had previously diagnosed the condition and treated him for it. *Id.* Even though the second doctor's approach "might support a medical malpractice claim" and "may have been mistaken, even gravely so," the court concluded that the claim was essentially a disagreement between an inmate and a physician over the inmate's proper care. *Id.* The Fourth Circuit has consistently found such disagreements "to fall short of showing deliberate indifference." *Id.* Because the medical records show that there was (1) no uniformity among the medical professionals on whether an inmate with Hendrick's condition required a single cell for medical reasons and (2) no clear evidence that failing to provide a single cell would pose an excessive risk to Hendrick's health and safety, Hendrick cannot show deliberate indifference to a serious medical need.

Hendrick's further argument, that his experience in a double cell provides additional evidence supporting a showing of an excessive risk to his health and safety, falls short. Hendrick has asserted that since the July 2014 decision to move him to a double cell, he has blacked out in

his cell, two different cellmates asked that he be moved out, and one told prison officials that he would not notify them if Hendrick needed medical attention. He has not provided any evidence, however, that any of his cellmates threatened him or caused him any harm. Nor has he shown that during his earlier time period in a double cell, from November 2013 to February 2014, any cellmates threatened or attacked him. To the contrary, the only identified violent episode involved Hendrick assaulting his cellmate while hallucinating about a bird flying in his cell.

Otherwise, the only evidence Hendrick has offered to show the excessive risk to his safety consists of his multiple references to incidents, unrelated to him or to inmates with his medical condition, in which inmates have assaulted or killed their cellmates at NBCI. Because none of those examples involved cellmates with the same or similar medical condition as Hendrick, this evidence is of little probative value. In the end, therefore, Hendrick relies primarily on his subjective concerns for his safety, which are insufficient to prove the excessive risk to his health and safety necessary to establish a deliberate indifference claim based on the decision to move him to a double cell. *See Rhodes*, 452 U.S. at 347–49 (analyzing the objective state of the prison, rather than the subjective impressions of prisoners, in finding that double cells do not violate the Eighth Amendment's Cruel and Unusual Punishment Clause); *Williams v. Bishop*, No. RWT-12-1616, 2014 WL 4662427, at *6 (D. Md. Sept. 16, 2014) ("A prisoner's strong desire to be in a single cell, based on his belief that his medical conditions cause difficulties with cellmates, does not entitle him to housing in a single cell unless medical providers have made a directive for a single cell based on a medical need."); *cf. Wolff v. Hatcher*, 936 F.2d 581, No. 90-16304, 1991 WL 113213, at *1 (9th Cir. June 24, 1991) (denying claim that defendant convicted of child molestation offenses had a constitutional right to a single cell to avoid abuse by other prisoners).

Based on this record, Hendrick has not demonstrated that the decision to place him in a double cell poses an "excessive risk to inmate health or safety," *Jackson*, 775 F.3d at 178, or that the decision to do so was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness," *Miltier*, 896 F.2d at 851. Accordingly, Defendants are entitled to summary judgment on Hendrick's Eighth Amendment claim based on Hendrick's placement in a double cell.[3]

### C. Failure to Provide Psychological Treatment

Hendrick also appears to assert an Eighth Amendment deliberate indifference claim based on his assertion that Booth refused to provide him psychological treatment, even after he made written and verbal requests for assistance. Hendrick asserts that Booth has ignored these requests and told him that she does not care about his situation. This claim fails for multiple reasons.

First, the record does not support Hendrick's claim that he made repeated requests for psychological treatment. A review of Hendrick's medical records reveal that from the time of the July 16, 2014 multidisciplinary team assessment of Hendrick until he filed his Complaint on December 24, 2014, Hendrick submitted eight written "sick call request" forms, on July 25, 2014; July 26, 2014; August 10, 2014; September 1, 2014; September 27, 2014; September 28,

---

[3] Bohrer would also be entitled to summary judgment on this claim because as a nonmedical prison official, Bohrer was entitled to rely on the opinions, judgment, and expertise of prison medical personnel in determining the medically necessary course of treatment. *Miltier*, 896 F.2d at 854. Bohrer's response to Hendrick's November 16, 2014 Inmate Request Form, in which Bohrer wrote, "You do not meet the criteria for a single cell we feel you are better off with someone in the cell in case of medical emergency," Bohrer Inmate Request Form, exhibits precisely the sort of reliance on medical professionals that warrants summary judgment on deliberate indifference liability. *See Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995) (observing that "if these prison officials had provided the wheelchair to Shakka in contravention of [the psychologist's] instructions, they might have incurred liability for interfering with Shakka's treatment").

2014; November 11, 2014; and November 16, 2014. In each of these requests, his specific request was to be returned to a single cell. In none did he request a psychological evaluation or treatment. Even in the form specifically sent to Booth on November 11, 2014, the only requests Hendrick made were "Please return me to my single cell!" and "I request to return to my single cell." Booth Inmate Request Form. He made no request for a psychological evaluation or treatment.[4]

Likewise, during that same time period, Hendrick was seen by medical professionals on eight occasions: July 28, 2014; July 29, 2014; July 31, 2014; August 12, 2014; August 29, 2014; September 5, 2014; October 8, 2014; and December 4, 2014. On each occasion, his primary request was to be returned to a single cell. The records of those visits do not indicate that he made any requests for a psychological evaluation or treatment. Thus, the objective records, including Hendrick's own written sick call request forms, reveal that Hendrick's singular focus during this time period was to convince the medical staff to return him to a single cell, not to secure psychological treatment.

Second, although a nurse who saw Hendrick on September 5, 2014 referred him to the mental health department for counseling,[5] Booth had previously examined Hendrick on July 16, 2014 with the rest of the multidisciplinary team and determined that his condition is fundamentally not a psychological disorder. In statements that Hendrick does not dispute, Booth has found that "many of the symptoms inmate Hendrick described were congruent with effects

---

[4] Although Hendrick claims that he also made verbal requests to Booth when he saw her in the corridor of the prison or near the line to receive medication, as Booth explains in her declaration, "[i]n order to receive an appointment with the mental health department, the inmate must make a request" to the mental health department. Booth Decl. ¶ 3. Hendrick has shown, through the numerous written sick call requests he submitted, that he knows how to submit such a request.

[5] Hendrick also notes that during visits on January 2 and 19, 2015, after he filed his Complaint, a nurse referred him to "psychiatry" and "behavioral health." Med. Records at 12-15.

that could be caused by his medical condition, despite his insistence that his symptoms were psychological" and that "[m]any mental health diagnoses require that it be ruled out that the symptoms are not caused by a primary medical condition." Booth Decl. ¶ 4. She conveyed this judgment to him in her response to the November 16, 2014 Inmate Request Form, in which she stated, "[y]our symptoms of anxiety are secondary to the medical issues you've cited above. Please write to medical." Booth Inmate Request Form.

Thus, to the extent that Booth and her colleagues in the mental health department did not meet with Hendrick during this time period, she had already concluded, after examination, that Hendrick does not suffer from a psychological disorder. At most, Hendrick has shown that he and a nurse disagree with Booth's informed opinion that he does not need psychological treatment. The fact that medical professionals may differ on a recommended course of treatment does not establish deliberate indifference. *See Jackson*, 775 F.3d at 178 (finding that such disagreements "fall short of showing deliberate indifference").

Finally, Hendrick's claim must be viewed in the overall context of his medical care. Given the numerous examinations and tests, prescriptions for different medications in varying doses, and recommendations for surgical procedures, it would be difficult to argue that anyone on Hendrick's medical team, which includes Booth, exhibited "deliberate indifference" to his needs. That team thoroughly reviewed Hendrick's medical records and evaluated him in person. Based on this evidence and their medical opinion, they determined that Hendrick needs surgery in order to address his worsening symptoms, but he has repeatedly refused such surgery. Because the medical records show that (1) Hendrick's appeals to medical staff focused entirely on securing a single cell, not on obtaining psychological treatment, and (2) that Booth had reached an informed conclusion that Hendrick required medical treatment, such as the surgery he

consistently refused, rather than psychological treatment, the evidence does not support a finding that the failure to provide psychological treatment during the time frame leading up to the Complaint constituted deliberate indifference to a serious psychological need. Thus, Defendants are entitled to summary judgment on Hendrick's Eighth Amendment claim arising from the alleged lack of psychological treatment.

### III.     Due Process Claim

Hendrick also alleges a violation of his due process rights under the Fourteenth Amendment. His claim appears to be that the violation arises from the "arbitrary action" of his placement in a double cell while NBCI was on notice that he "suffers the risk of serious harm." Compl. ¶ 16. To establish a due process violation, a prisoner must prove that there was (1) a protected liberty interest in the classification sought; (2) the interest was adversely affected by the defendant's actions; and (3) due process protections were not provided. *Slezak v. Evatt*, 21 F.3d 590, 593 (4th Cir. 1994). In the absence of a right created by state law, a prisoner has no protected liberty interest in being housed in a particular facility or in a particular security or custody status. *See Olim v. Wakinekona*, 461 U.S. 238, 244–45 (1983); *Slezak*, 21 F.3d at 594; *Wetzel v. Edwards*, 635 F.2d 283, 289 (4th Cir. 1980). Having identified no state law establishing a right to a single cell, Hendrick has no protected liberty interest in single cell status. Accordingly, Hendrick's due process claim fails, and summary judgment will be granted on this claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED. All claims are DISMISSED. A separate Order shall issue.

Date: December 3, 2015

THEODORE D. CHUANG
United States District Judge